IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

THOMAS MATTHEW RIEMER                                                    PLAINTIFF

v.                          Civil No. 5:23-cv-05161-TLB-CDC

SHERIFF JAY CANTRELL, Washington
County, Arkansas; DEPUTY CODY REX; and
APRN KELLEY HINELY, Karas Correctional
Health                                                                  DEFENDANTS

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Thomas M. Riemer ("Riemer"), filed this civil rights action under 42 U.S.C. § 1983.  Reimer proceeds *pro se* and *in forma pauperis*.  Riemer maintains his constitutional rights were violated: (1) when excessive force was used against him by Defendant Rex; and (2) he was denied adequate medical care for the resulting injuries.  Pursuant to the provisions of 28 U.S.C. §§ 636(b)(1) and (3), the Honorable Timothy L. Brooks, United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation.

The case is before the Court on the Motion for Summary Judgment on the issue of exhaustion of administrative remedies filed by Defendant Hinely. (ECF Nos. 85-87 & Supp. 94). Defendants Cantrell and Rex have also filed a Motion for Summary Judgment on the issue of exhaustion.  (ECF Nos. 95-97).  Reimer has responded to both Motions.  (ECF Nos. 99-100 & 106-08).  Replies and sur-replies have been filed.  (ECF Nos. 105, 112, 111, 121).  The Motions are ready for decision.

1

## I.    BACKGROUND

Riemer filed this action on September 26, 2023. (ECF No. 1). At the time, Reimer was incarcerated in the Washington County Detention Center ("WCDC") on federal charges.   *Id.* at 2.   On August 26, 2024, Riemer was allowed to substitute Defendant Hinely in place of Karas Correctional Health.[1]   (ECF No. 73).   In view of the substitution, Riemer was directed to file an amended complaint which was filed on October 4, 2024; the Second Amended Complaint (ECF No. 77) is the operative pleading in this case.

According to Claim One, on June 1, 2023, while Riemer was at lunch, Defendant Rex announced that Riemer was needed outside the A-9 unit. (ECF No. 77 at 5).   Because being called outside the unit typically took significant periods of time, Riemer replied that he needed to urinate before leaving.   *Id.*   After he urinated, Riemer went back to his bunk to retrieve some toilet paper to wipe the seat.   *Id.*   As Riemer was wiping the seat, Defendant Rex "charged in the Unit and grabbed my left arm and twisted it behind my back and moved me away from the toilet and walked me away from the toilet and walked me out of the Unit door."   *Id.* at 5-6. Defendant Hinely was outside the door and asked Riemer how he was.   *Id.* at 6.   He replied that his shoulder hurt.   *Id.*   At that point, Defendant Rex allegedly said: "I did not twist your arm that hard."   *Id.*   Defendant Rex is sued in his individual capacity only.   *Id.*

In Claim Two, Riemer alleges Defendant Hinely heard Defendant Rex admit he had twisted Riemer's arm.   (ECF No. 77 at 7).   Despite this admission and Riemer's complaints of his shoulder hurting, Defendant Hinely failed to examine his shoulder and merely advised him to

---

[1] Karas Correctional Health ("KCH") had filed a Motion for Summary Judgment on the issue of exhaustion.   (ECF Nos. 48-50). Prior to this Motion being ruled on, Riemer dismissed his claims against KCH.

Case 5:23-cv-05161-TLB-CDC    Document 122    Filed 07/16/25    Page 3 of 22 PageID #: 613

use the kiosk to submit a medical request. *Id.* Defendant Hinely was only willing to see him for the skin issue she was there to discuss. *Id.* Riemer alleges he reported his shoulder injury on the kiosk but did not receive a physical examination until November 30, 2023. *Id.* Instead, he only received prescriptions for either Tylenol or Ibuprofen, a blanket authorization, a second mat authorization, and X-rays which Riemer maintains were inadequate to diagnose soft tissue injuries. *Id.*

When he was booked in, Riemer says he self-reported "my previous 10 shoulder replacement surgeries." (ECF No. 77 at 8). Riemer indicates that – at the time of his arrest – his shoulder "was repaired, stable, functional and pain free." *Id.* Due to the fact Defendant Hinely possessed his medical records, Riemer maintains Defendant Hinely should have immediately performed a physical examination of his shoulder. *Id.* Riemer maintains it ended up taking six months to receive an examination by Defendant Hinely. *Id.* Riemer has sued Defendant Hinely in her individual capacity. *Id.* at 9.

In Claim Three, Riemer alleges Defendant [Sheriff] Cantrell failed to properly supervise, train, or protect him from attack by Defendant Rex. (ECF No. 77 at 9). Riemer contends Defendant Cantrell has continued to employ Defendant Rex despite his having previously displayed aggressive tendencies towards detainees and despite the June 1, 2023, incident involving Riemer. *Id.* at 10. Riemer has sued Defendant Cantrell in both his individual and official capacities.[2] *Id.*

---

[2] Riemer's Claim Four and Five were severed and transferred to the United States District Court for the Western District of Missouri. (ECF No. 80). The United States Marshal Service had already been terminated as a Defendant and Riemer was not allowed to reassert his claim against USMS. *Id.*

3

As relief, Riemer is seeking compensatory damages against Defendant Rex. (ECF No. 77 at 11). Additionally, Riemer seeks an award of punitive damages from each liable Defendant. *Id.*

## II.     APPLICABLE STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Commerce v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing, Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

4

## III.  DISCUSSION

As previously noted, two Motions for Summary Judgment have been filed.  The undersigned first reviews the goals of the exhaustion requirement, the WCDC's grievance procedure, and Riemer's kiosk submissions and the addresses the two Motions in turn.

### A.  The Exhaustion Requirement

The purpose of an exhaustion requirement is two-fold.  First, exhaustion gives an agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89 (2006) (internal quotation marks and citation omitted). Second, "exhaustion promotes efficiency. Claims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." *Id.*

The Prison Litigation Reform Act ("PLRA") in 42 U.S.C. § 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  The Supreme Court concluded the PLRA's exhaustion provision serves these goals.  *Woodford,* 548 U.S. at 94. "It gives prisoners an effective incentive to make full use of the prison grievance process and accordingly provides prisons with a fair opportunity to correct their own errors."  *Id.*

The PLRA "requires a prisoner to exhaust such administrative remedies as are available before suing over prison conditions." *Booth v. Churner,* 532 U.S. 731, 733-34 (2001), *see also Porter v. Nussle*, 534 U.S. 516, 524-25 (2002) (exhaustion is mandatory). This is true even if the relief sought, *e.g.,* monetary damages, cannot be granted by the administrative process.  *Booth,*

532 U.S. at 734.   But "[i]f an inmate fails to exhaust one or more discrete claims raised in the § 1983 complaint, the PLRA requires only that the unexhausted claim be dismissed – it does not require that the complaint be dismissed in its entirety." *Abdul-Muhammad v. Kempker,* 486 F.3d 444, 446 (8th Cir. 2007) (citing *Jones v. Bock,* 549 U.S. 199 (2007)).

In *Jones v. Bock*, 549 U.S. 199 (2007), the Supreme Court concluded "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules."  *Id*. at 218 (internal quotation marks and citation omitted).  The Court stated that the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  *Id*.  A prisoner's remedies are exhausted "when [the] inmate pursues the prison grievance process to its final stage and receives an adverse decision on the merits."  *Hammett v. Cofield*, 681 F.3d 945, 947 (8th Cir. 2012).

As discussed in *Ross v. Blake,* 578 U.S. 632 (2016), the PLRA had its own built-in exception to the exhaustion requirement; a prisoner need not exhaust remedies if they are not available.  *Id.* at 635-36.    Available means "capable of use to obtain some relief for the actions complained of."  *Id.* at 642 (internal quotation marks omitted).   Remedies are unavailable when: (1) the remedy "operates as a dead end – with officers unable or consistently unwilling to provide aggrieved inmates any relief"; (2) the remedy is "so opaque that it becomes, practically speaking. incapable of use" where "no ordinary prisoner can discern or navigate it"; or (3) "when prison administrators' thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id*. at 643-644.   Lack of exhaustion is an

6

affirmative defense which must be proved by the Defendants. *Nerness v. Johnson,* 401 F.3d 874, 876 (2005) (per curiam).

## B. The WCDC Grievance Policy

The WCDC grievance procedure is set forth in the Inmate Handbook. (ECF No. 87-2 at 4-5). Inmates are informed that the grievance procedures are as follows:

> You are allowed to file a grievance if you feel you have been subjected to abuse or an abridgment of your civil rights while being detained. All grievances will be done on the kiosk in your cellblock.
>
> A grievance must be submitted within ten days from the time the event complained of occurred. The grievance should include:
>
>> A. The date and approximate time of the event
>> B. The name(s) of the person(s) involved
>> C. The name(s) of any witness(es)
>> D. Pertinent details of the event
>
> All grievances are reviewed by the Jail Administrator or their designee. If you feel your grievance was improperly handled, you may appeal to the Sergeant or Lieutenant.

(ECF No. 87-2 at 4-5).

Defendants have not submitted the actual grievance policy with their exhibits; however, the Court takes judicial notice of the policy as it recently was submitted in *Clampit v. Allen, et al.,* 5:24-cv-05083-TLB-CDC (ECF No. 22-4 at 1-2).[3] *See e.g., United States v. Wings,* 106 F.4th 793, 795 (8th Cir. 2024) ("We may take judicial notice of any fact that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned, *see* Fed. R. Evid. 201(b)(2), as long as it is not unfair to a party to do so and does not undermine the trial

---

[3] The authenticity of the policy was attested to by Mulvaney in *Clampit.* In this case, Mulvaney's affidavit was submitted in connection with both summary judgment motions; however, for some unknown reason the grievance policy itself was not provided.

court's factfinding authority.") (internal quotation marks and citation omitted).

The stated purpose of the WCDC grievance policy (D11.5) is:

> Any detainee shall be allowed to file a grievance whenever the detainee believes they have been subjected to abuse, harassment, an abridgment of civil rights, or a denial of privileges specified in the Detainee Handbook. Grievances must be restricted to incidents that occur while the detainee is in the custody of the facility. The grievance procedure is an internal administrative means for the resolution of complaints and the identification of potentially problematic areas.

(ECF No. 22-4 at 1). The outlined procedures are more detailed than those contained in the Inmate Handbook. *Id.* at 1-2. With respect to the timing of grievances, it provides that "[g]rievances must be filed within 10 days of the incident unless there is good cause for a reasonable delay. Grievances filed more than 30 days following the alleged incident will not be considered." *Id.* at 2. It further provides a list of concerns or decisions that are not subject to appeal including medical decisions, treatment, or testing. *Id.*

### C.    Reimer's Requests/Grievances

On June 2, 2023, Reimer submitted a medical request stating:

> My left shoulder after 10 surgeries was replaced with a Hemi-arthroplasty. After the guard twisted my left arm behind my back (which you witnessed today), he has damaged the fragile left-shoulder joint. My [shoulder] now []is in constant pain and I can feel cracking and popping (for the lack of a better term) in the mu[s]culature of my shoulder. These are NEW symptoms!

(ECF No. 87-1 at 14). In response, Defendant Hinely order an X-ray. *Id.* A prescription for Ibuprofen was also issued. *Id.* The X-ray was taken on June 7th. *Id.* at 2. On June 8th, Riemer was advised that the radiologist reported no acute fracture or dislocation of Reimer's shoulder. *Id.* at 19. He responded that: "[a]n x-ray is an inadequate way to determine soft-tissue damages . . . torn muscle tissue, or torn rotator cuff." *Id.* at 20. Defendant Hinely responded that she would send a request for an orthopedic consult to the United States Marshal

8

Service (USMS).  *Id.* at 20.

On June 28, 2023, Riemer submitted the following general request:

> Corporal Mulvaney I was assaulted by corporal rex on or about June 1st.  [H]e called my name and [I] was using the restroom.  [I] retrieved some toilet pape[r] to wipe down the seat and [I] was grabbed from behind while wiping down the seat, my arm twisted behind my back and [I] was forced to the pod door.  [I] have an artificial shoulder on the arm he brutally twisted and now the hardware in that shoulder has a malfunction and will need to be repaired.  [I] will need the footage saved as [I] am in the process of filing a U. S. C. 1983 and that footage will correlate my cause for complaint for my claim.  [T]his occurred between 11 a.m. and 1 p.m.. [T]han[k] you sir.

(ECF No. 94-1 at 5).  Corporal Mulvaney ("Mulvaney") asked if this had occurred in A-9.  *Id.* Riemer responded it had.  *Id.*  On June 29th, Mulvaney asked for additional information on where in the pod the incident had occurred because he could not locate the incident in question on the video. *Id.* at 6. Riemer replied with more information. *Id.* On June 30th, Mulvaney indicated he had located the video. *Id.*   Riemer stated:

> I want to press criminal charges against Rexx for the unprovoked assault w[h]ich you have saved video evidence of.   I would like to file a police report through the sheriff[']s office as soon as possible.   Thank you for saving same video.  *Id.*

On June 29, 2023, Riemer submitted a request saying the pain in his left shoulder and lack of sleep it was causing was getting intolerable.  (ECF No. 87-1 at 23).  He asked for some Tylenol or Ibuprofen.  *Id.*  Defendant Hinely prescribed acetaminophen and Ibuprofen for a month.  *Id.*

On June 29, 2023, Riemer submitted the following grievance:

> On or about June 1st 2023, I was called to the door of A-4.  Not knowing the reason I prudently decided to void my bl[a]dder.   While wiping off the commode seat, I was physically assaulted from behind in a wholly unprov[ok]ed manner by WCDC employee Rexx (sic).  He grasped my left arm and callously twisted it behind my back and walked me to the door.  This was done in full view of the entirety of A-9, lined up for chow, 3 or 4 other wCDC employees, and healthcare

provider Kelley Nelley.  Once outside Kelley Nelley asked me "how are you?" to which I responded "my shoulder hurts" causing Rexx to exclaim "I didn't twist it that hard" admitting to the unpro[vok]ed assault, in front of Nelley and the 3 or 4 other WCDC employees.  I had underwent a series of ten (10) left shoulder replacement surgeries from Dec 2017 August 2020.  This afforded me a stable, functional, and pain-free, left shoulder/arm.  After Rexx's unwarranted callous act this is no longer true.  wCDC is refusing to provide the medical care I now need due to the injury I suffered at the hands of their employee.  I should not be fo[r]ced to leave this facility in worse p[h]ysical condition than I entered after being injured in an unprovoked assault by WCDC employee Rexx.  I want to press criminal charges on Rexx for  his unprovoked assault and physical injury to my person.  I am going to p[u]rsue a Federal USC 1983 civil rights lawsuit on this "excessive use of force" incident against Rexx, Sheriff Jay Cantrell and the Washington County Sheriff's Department.  Other remedies can consist of:  Rex apologizing to me in front of the A-9 residents, Nelley, and other employees present Rexx forfeiting his job and position of public trust for the citizens of Washington County, and the people of Arkansas.  Rexx and Washington County bearing the expense of any and all medical care I may need to repair my shoulder and restore its condition.

(ECF No. 87-2 at 6) (sic in original).

Mulvaney responded the same day asking why Riemer submitted "a completely new Grievance when you and I had already been corresponding in one about this exact same incident?" (ECF No. 87-2 at 7).  Riemer replied that he had "not filed a formal grievance" and was trying to follow "the proper way to address an issue per the WCDC handbook."  *Id.*  Riemer also stated he had never addressed anything to Mulvaney and did not realize he was corresponding with him.  *Id.*

On June 30, 2023, Mulvaney wrote:

Sir, If you are trying to go by the detainee handbook, which you should be.  You will find on page 19 the following procedures for filing a grievance. . . . Grievance Procedures: You are allowed to file a grievance if you feel you have been subjected to abuse or an abridgment of your civil rights while being detained.  All grievances will be done on the kiosk in your cellblock.  A grievance must be submitted within ten days from the time the event complained of occurred.  The grievance should include: A. The date and approximate time of the event B. The name(s) of the person(s) involved C. The name(s) of any witness(es) D. Pertinent

10

details of the event.    You will find that you have waited almost an entire month to file your grievance, and not the required 10 days.    Technically I, or WCDC, do not have to follow up with a response to your grievance here.    You should have known the previous correspondence was between myself and you, as I sign all of my responses, and the header of each response automatically gives the responding officer's name.    Cpl. Mulvaney.

(ECF No. 87-2 at 8).

On July 6, 2023, Mulvaney wrote:

Mr. Reimer, I have reviewed the video of this incident involving yourself and Cpl. Rex.    I have not found anything that even looks remotely close to excessive force, or anything t[h]at appears to be assaultive.    If you do not agree with my response then you will need to submit a grievance on the issue, and let a Sgt. or Lt. respond after they review the video of this incident.    If you choose to try and file criminal charges on Cpt. Rex you may do so with the misdemeanor division of the prosecutor's office.    They are the part responsible for filing criminal charge with the state, not us.

(ECF No. 94-1 at 7).    Riemer responded on July 13th as follows:

My left shoulder had 10 (ten) replacement surgeries from Dec 2017-Aug 2020 to afford me a stable, functional, pain-free shoulder/arm.    Your judgement in evaluating the injury to my person is meaningless without you being an Orthopedic Medica[l] Doctor to examine my shoulder and evaluate my injury.    But I must thank you for arrogantly reopening the door to the grievance process, and my U. S. C. 1983 Federal Civil Rights lawsuit against E. Rex and the W. C. S. O. for my injury and denial of medical care.

*Id.*

On July 13, 2023, Riemer submitted the following grievance:

Attention Sgt. or Lt. having authority over Cpl. Mulvaney's ability to make legal decisions/findings.    Cpl. Rex assaulted me in an unprovoked and uncalled for manner, Mulvaney saved the video and arbitrarily de[]cided the assault was no big deal.    I had a series of ten[](10) replacement surgeries on my dominant left shoulder between Dec. 2017-Aug. 2020, which afforded me a stable, functional, and pain-free shoulder/arm.    By Mulvaney den[y]ing me medical care his opinion is pointless and tilted in Rex's favor.    Mulvaney's amateur (sic) attempt to diagnose what was medically injurious to my person is of no value except as added grounds to any Federal U. S. C. 1983 Civil Rights Lawsuit I will bring forth.

11

(ECF No. 87-2 at 9) (sic in original).    The grievance was originally assigned to Mulvaney but he asked that it be reassigned since he could not "answer a grievance against myself."    *Id.* at 10. Despite this, Mulvaney wrote the following comments:

> He was literally seen by Kelly as this happened.   I mean he was walked directly to Kelly as this took place.   Watching the video I never say anything I felt was excessive, nor did Mr. Reimer appear to be in any sever[e] pain during this incident.

*Id.*   The grievance was reassigned to Lieutenant Arnold.   *Id.* at 9.

On July 19, 2023, Lieutenant Arnold responded that they had "looked into this incident and are not seeing an excessive use of force from Rex."   (ECF No. 87-2 at 9).   Riemer was asked if he had contacted the medical department to have his shoulder looked at.   *Id.*

On July 19, 2023, Riemer appealed saying:

> Yes if [y]ou look at all my conversations with Mulvaney we had a continuing conversation about my injury and further medical care has been refused.   But medical will give me Tylenol and Ibuprofen for pain, this will not repair the damage to my shoulder.   Mulvaney questioned my filing a grievance and refused my requesting criminal char[g]es be filed against Rex.   Left is my dominant hand and something is torn in my shoulder most certainly needing surgical repair.

(ECF No. 87-2 at 10).   On July 20th, Lieutenant Carrier advised Riemer that if he needed further medical care, he should put a request in the kiosk.   *Id.*   Further, Lieutenant Carrier stated "the incident has been reviewed and they did not see excessive force from Rex."   *Id.*

On July 20, 2023, Riemer submitted a medical request saying his shoulder needed to be examined by an orthopedic doctor.   (ECF No. 94-1 at 61).   He indicated he had been suffering for six weeks.   *Id.*   In response, Riemer was told his orthopedic appointment had been denied by the USMS.   *Id.*   The following day, Riemer asked "[w]hy should the USMS be responsible for the expense of any injury caused mali[]ciously, and purposely at the hands of an arrogant, out-

12

of-control, and egotistical Washington County Sheriff['s] Deputy?" *Id.* at 62. Riemer was advised that it was because he was a "USMS detainee" and they were responsible for his medical care. *Id.*

On August 13, 2023, Riemer again requested medical attention for his left shoulder. (ECF No. 87-1 at 29). He noted the injury was caused by Defendant Rex's unprovoked assault. *Id.* He stated: "You must petition the USMS to get me in to see an Orthopedic doctor. Remind them refusing me medical care is a violation of my Civil Rights." *Id.* In response, he was asked if he would like to renew his Tylenol or Ibuprofen prescription. (ECF No. 94-1 at 66). Riemer requested Tylenol. *Id.*

On August 30, 2023, Riemer asked for the "grievance numbers for all my contacts regarding the injury to my left shoulder" because of the "unprovoked assault on me by Cpl. Rex." (ECF No. 94-1 at 14). He noted he was going to bring a lawsuit against the USMS "since you are claiming they are responsible for denying me medical care for my injured left shoulder." *Id.* Mulvaney responded providing grievance numbers for June 29, 2023, July 13, 2023, and August 3, 2023. *Id.* Mulvaney said he had never told Riemer that the USMS was responsible for denying him medical treatment. *Id.* Riemer apologized saying someone had told him that three times while messaging medical. *Id.*

On August 31, 2023, Mulvaney replied to Riemer's July 13th response as follows:

While searching for Grievance numbers pertaining to another request I came across this general request that has gone un-responded to that you and I had going previously. I never "evaluated" nor have I claimed to "evaluate" any injury you have, or may have. I am not a medical doctor. Also, the date and time of the incident you['re] talking about, you saw the nurse practitioner, Kelley Hinely, immediately. You were literally walked directly to her in the hallway by Cpl. Rex. Is there anything else regarding this request, or may I close it now.

(ECF No. 94-1 at 8).   On September 3rd, Riemer responded he has seen Defendant Hinely about another matter and "as you people here do it would not be discussed until I put it on the kiosk." *Id.*

On September 8, 2023, Riemer submitted the following medical request:   "Not to beat a dead horse, but my dominant left shoulder is getting less functional and more painful as time progresses."   (ECF No. 94-1 at 76).   In response, he was thanked for letting medical staff know. *Id.*   The same day, Riemer wrote:   "You stopped the Tylenol, I definitely need it to continue. I was not beating a dead horse to amuse myself."   *Id.* at 77.   In response, Riemer was advised that the Tylenol was "not an unending prescription."   *Id.*   His request to have it restarted was sent to Defendant Hinely.   *Id.*

On September 9, 2023, Riemer submitted a medical request stating:

> My shoulder was injured/torn by the unprovoked, and un[n]ecesary action of Washington County Sheriff['·]s Deputy Corporal Rex.   It will not heal itself, heal[]ng requires the proper medical care.   Proper medical care is what you are denying me.   It will continue to stay very painful and deteriorate in function until proper medical care is afforded me and my injured shoulder.

(ECF No. 94-1 at 78).   In response, Riemer was told the USMS "denied approval for ortho."   *Id.* He was asked if he needed refills for Tylenol or Ibuprofen.   *Id.*   Riemer asked for Tylenol.   *Id.*

On November 20, 2023, Riemer wrote:

> Kelley Hinley had issued me a medical blanket to support my left should that was injured by floor officer E. Rex.   It greatly reduced my need to take Tylenol for the pain in my injured shoulder.   I was told that I must request to have it re-issued to me.   I should only be here until mid-December can I please have the medical blanket re-issued so I can reduce the pain and get some sleep?   Thank you.

(ECF No. 94-1 at 98).   He was advised his request was being sent to the provider, *i.e.,* Defendant Hinely.   *Id.*

14

On November 28, 2023, Riemer submitted a medical request stating that over the past couple of days the "pain in my injured left shoulder has gotten [exponentially] worse." (ECF No. 87-1 at 52). He stated he could not even use it to lift a fork to feed himself. *Id.* He indicated he was left-handed and asked again "to see a doctor to get the [proper] diagnosis and medical care to address the injury [he] suffered at the hands" of Defendant Rex. *Id.* At a minimum, Riemer requested that Tylenol be started again. *Id.* Reimer was examined by Defendant Hinely. *Id.* at 54-55. She ordered another X-ray. *Id.* at 55. The X-ray showed osteoarthritis of the acromioclavicular joint but no "demonstrated soft tissue abnormality." *Id.* On December 2nd, Riemer asked about the X-ray findings. (ECF No. 94-1 at 100). He was told: "Impression: stable examination. Total shoulder arthroplasty. OA of the AC joint. No acute finding." *Id.* On December 4th, Riemer asked: Can you diagnose any soft-tissue damage via the x-ray?" *Id.* at 101. In response, he was told: "Unfortunately, X-rays are not typically diagnostic for soft-tissue abnormalities. The provider has informed me that we have requested an orthopedic consult through the US Marshals." *Id.*

Defendant Hinely remarked they would await approval for an orthopedic consult. (ECF No. 87-1 at 55). On December 4th, another request was sent to the USMS for an orthopedic consult. *Id.* The USMS approved an orthopedic consult on December 18th. *Id.* The following day, an appointment was scheduled for January 3, 2024. *Id.* at 57.

On January 2, 2024, Riemer asked that his Tylenol prescription be refilled because his shoulder was in a lot of pain. (ECF No. 87-1 at 57). His request was approved. *Id.* On January 3rd, Riemer was taken to his orthopedic appointment. *Id.* at 58.

### D. Defendant Hinely's Motion for Summary Judgment

Defendant Hinely is employed as an Advanced Practice Registered Nurse (APRN) for KCH and works at the WCDC. (ECF No. 87-1 at 1). KCH is the medical care provider for the WCDC. *Id.* Defendant Hinely moves for summary judgment, maintaining Reimer failed to exhaust his administrative remedies with respect to his claim against her. In fact, Defendant Hinely says Riemer conceded this failure in a reply to her answer filed on October 25, 2024.[4] (ECF No. 84). Specifically, Reimer stated: "Plaintiff concedes that [he] did not file 'a grievance against Separate Defendant Hinely at all naming her and asserting the allegations he now asserts against her.'" *Id.* at 3. Defendant Hinely maintains she is entitled to dismissal of the claims against her.

Riemer presents multiple arguments in opposition. First, Riemer argues he was unaware of Defendant Hinely's deliberate indifference until he learned of "her actual involvement" when her affidavit was filed with KCH's summary judgment motion which was filed after he left the WCDC. (ECF No. 99 at 1). As such, he maintains pursuit of the grievance process once he was no longer incarcerated at the WCDC, would be futile. *Id.* at 2. This argument is unavailing. As established by Riemer's requests and grievances, he was aware Defendant Hinely was the WCDC medical care provider while he was in the WCDC.

Second, Riemer argues his request for punitive damages against Defendant Hinely is outside the scope of the administrative remedy process. (ECF No. 99 at 2). The Supreme Court has expressly rejected such an argument. *Booth,* 532 U.S. at 734. In *Booth,* the Supreme Court

---

[4] The Court agrees that the reply to the answer was not a proper filing in this case. However, Defendant Hinely did not move to strike the pleading she now relies on.

held the administrative process must be utilized even if the requested relief cannot be granted. *Id.*

Third, Riemer argues when he was processed into the WCDC he was not given any instructions on how to operate the kiosk. (ECF No. 99 at 2).   He asks the Court to consider there is only one kiosk for fifty-five to sixty inmates to share and this does not allow sufficient time to scour the kiosk "for any proper way to file a 'grievance.'"   *Id.*   He indicates he did not have a printed version of the handbook to read.   *Id.*   Moreover, he argues he "was accustomed to 'grieving' with Medical matters by the 'Medical Services' selection on the Kiosk."   *Id.* at 3. Riemer states that if he has a problem with the medical department, he talks to them rather than look for another route he is unfamiliar with.   *Id.*

While the undersigned does not doubt that time on the kiosk is limited by the number of inmates in the pod, it is clear from the summary judgment record that Riemer did know how to operate the kiosk, knew there were various categories of requests, and knew how to file a grievance.   This is evident from the workflow interaction record submitted by Defendant Hinely which shows Riemer made kiosk entries under educational services, food services, general requests, grievances, legal services, and medical services.   (ECF No. 94-1 at 1-103).   While it is true Riemer's first grievance was not filed until June 29, 2023, this does nothing to establish Riemer's ignorance of the availability of the grievance process.   *Id.* at 33.   Nor does Riemer's alleged ignorance of the proper way to grieve medical issues equate to the administrative remedy being unavailable. The "question under § 1997e(a) is not whether a prisoner *perceived* administrative remedies as being unavailable, but whether administrative remedies were *in fact* unavailable."   *Butala v. Gerlicher,* Civil No. 13-cv-0633, 2014 WL 241865, *10 (D. Minn. Jan.

17

22, 2014) (citing *Lyon v. Vande Krol,* 305 F.3d 806, 809 (8th Cir. 2002) (en banc) ("[Section] 1997e(a) does not permit the court to consider an inmate's merely subjective beliefs, logical or otherwise, in determining whether administrative procedures 'are available.'")).

Fourth, Riemer argues the grievance process is written with "the passive language of you are allowed to file a grievance" and "you may appeal."   (ECF No. 99 at 4).   Riemer maintains that nowhere in the grievance procedure does it state that exhaustion requires the submission of *both* a grievance and an appeal.   The undersigned agrees that use of this permissive language does suggest, especially to those unlearned in the law, that pursing a grievance is optional and not mandatory.   Unfortunately, even if he reasonably believed the WCDC grievance procedure was optional, it was available to him.   It is the PLRA that mandates exhaustion of available administrative remedies—it is not optional.   42 U.S.C. § 1997e(a).   *See also Booth,* 532 U.S. at 739 & 741 n. 6 (There is no requirement that prison grievance procedures be "plain, speedy, and effective," and prisoner must comply with the grievances procedure even if he believes it would be futile.).   Thus, if Riemer wants to seek judicial relief, he must fully exhaust his administrative remedies before filing suit.   The permissive language does not render the administrative remedy unavailable for purposes of the PLRA.   *See e.g., Owens v. Keeling,* 461 F.3d 763, 770 n.4 (6th Cir. 2006) (Available remedies include all optional levels of administrative review provided by the facility); *Wagoner v. Lemmon,* 778 F.3d 586, 590 (7th Cir. 2015) ("Since the passage of the PLRA, exhaustion of remedies is not optional for a prisoner in cases to which it applies.").

Finally, Riemer argues Mulvaney was treating his requests as grievances as evidenced by his response on June 29, 2023, when he asked Riemer why he submitted a completely new grievance when they were already corresponding about the issue.   (ECF No. 99 at 5).   Riemer

notes Mulvaney in fact responded to the grievance in which Defendant Hinely was named. Riemer also asks the Court to consider the fact that he continued to complain or "grieve" to medical about the problems with his shoulder/arm movements for over five months.  *Id.*

As discussed more fully below, the Court agrees that Mulvaney in fact considered and responded to Riemer's June 29, 2023, grievance.  As the appeal procedures do not apply to medical issues, this fully exhausted the available administrative procedures with respect to Defendant Hinely.  Alternatively, the Court finds that the grievance procedure in so far as medical treatment is concerned operated as a simple dead end.  WCDC personnel simply referred Riemer back to the medical department without any investigation making the grievance procedure unavailable.  Defendant Hinely is not entitled to summary judgment on the issue of exhaustion.

### D.  Defendants Cantrell's and Rex's Motion for Summary Judgment

Defendants Cantrell and Rex move for summary judgment on the grounds that Riemer did not exhaust his administrative remedies on either his excessive force or denial of medical care claims against them.  With respect to the excessive force claim, Defendants maintain Riemer did not file a grievance regarding his June 1, 2023, injury within the specified ten-day period.  (ECF No. 96 at 5). The first grievance regarding the June 1st incident was not filed until June 29, 2023. *Id.*  Likewise, Defendants maintain no grievance was filed on his denial of medical care claim until June 29, 2023. *Id.* at 6. They say this grievance did not allege any wrongdoing on behalf of the Separate Defendants.  *Id.*

In opposition, Riemer argues he exhausted all administrative remedies that were available to him.  (ECF No. 107 at 1).  He points out that he immediately told Defendant Hinely about the injury.  *Id.* at 2.  Reimer indicates he communicated with medical about his serious injury and

it was not until he was told the USMS denied an orthopedic consult that he "felt compelled to send his first Grievance. With no knowledge of the Admin. Rem. Procedures, or guidelines of how to proceed with the Admin. Rem. Procedures." *Id.* at 3. For the first time since this case was filed, Riemer mentions having "three traumatic brain injuries." *Id.* However, he provides no support for this statement. *Id.* Riemer has filed coherent well-argued responses, provided citation to relevant case law, and has referred the Court to various exhibits. There is no suggestion in the record that Riemer has any trouble comprehending written materials.

More to the point, Riemer argues despite having been advised his grievance was untimely, it was accepted and decided on the merits. (ECF No. 107 at 4). He points out he appealed Mulvaney's denial of his grievance, and it was reviewed by Lieutenant Amanda Arnold and then Lieutenant Mariah Carrier. *Id.* Riemer maintains the "exhaustion requirement of the PLRA is also satisfied by an untimely filing of a grievance if it is accepted and decided on the merits by the appropriate prison authority." *Id.* at 5. Riemer also asks the Court to consider Mulvaney's comment asking Riemer why he filed a "completely new grievance" when they had already been corresponding about the issue. (ECF No. 108 at 3). Riemer suggests this comment establishes that Mulvaney was treating his general requests as grievances. *Id.*

The Court agrees that Mulvaney did consider the merits of the grievance regarding the alleged use of force by Defendant Rex and Riemer's shoulder injury despite its being untimely submitted. While true that Mulvaney advised Riemer that his grievance was not filed within the requisite ten days and stated that "[t]echnically I, or the WCDC, do not have to follow up with a response to your grievance," he failed to clearly advise or state that Riemer's grievance would not be considered. Indeed, Mulvaney did respond on July 6, 2023, finding no excessive force

20

had been used by Defendant Rex. (ECF No. 87-2 at 8); (ECF No. 94-1 at 7). Although Mulvaney's response is made under the kiosk caption "general requests," it was clear from Mulvaney's comment that he considered Riemer's requests and the grievance regarding the use of force by Rex to all be part of the same conversation between he and Riemer.  Riemer objected to Mulvaney's determination and requested further review.  (ECF No. 87-2 at 9).  On July 19, 2023, Lieutenant Arnold indicated she had reviewed the incident and did not see any excessive use of force on Rex's part.  *Id.* at 9.   Riemer was asked if he had contacted medical to have his shoulder looked at.  *Id.*   Riemer was again advised by Lieutenant Carrier that "the incident has been reviewed and they did not see excessive force from Rex."  *Id.* at 10.   Additionally, Riemer was again advised that if he needed further medical, he should put in a request on the kiosk.  *Id.* For these reasons, Defendants Cantrell and Rex are not entitled to summary judgment on the issue of exhaustion.

## IV.   CONCLUSION

For these reasons, it is recommended that:

(1)    The Motion for Summary Judgment (ECF No. 85-87) filed by Defendant Hinely be **DENIED**; and

(2)    The Motion for Summary Judgment (ECF No. 95-97) filed by Defendants Cantrell and Rex be **DENIED.**

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).   The failure to file timely objections may result in waiver of the right to appeal questions of fact.   The parties are reminded that objections must be both timely and specific to trigger de novo review by**

the district court.

   **Status of Referral:** **This case should remain referred for all matters not recommended for dismissal in this Report and Recommendation.**

   **RECOMMENDED** this 16th day of July 2025.

*Christy Comstock*
_____
CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE